LEIGH M. CLARK, Retired Circuit Judge.
A jury found Terry Lee Gilliland guilty of possession of marijuana, a controlled substance, and the court fixed his punishment at imprisonment for six years and imposed a fine of $1,000.00.
According to the undisputed evidence, the small apartment at which appellant lived with his wife, Mrs. Terry Gilliland, and their three-year-old daughter at 402V2 Smith Street, Andalusia, was searched pursuant to a valid search warrant. The defendant was not at the home at the time but was working elsewhere in or near Andalusia. Mrs. Gilliland was present at the time of the search and made no protest of the rather thorough search of the apartment consisting of a living room combined with a bedroom on one side and a kitchen and a bathroom on the other side.
The law enforcement authorities executing the search warrant found at various places within the apartment, including the drawers of a chest of drawers in the living room and on the refrigerator in the kitchen, the following items:
Four large bags of plant material identified by an expert witness as marijuana; two other bags of such plant material; two roach clips, described in the testimony as clips to hold marijuana cigarettes, a metal tray with plant material consisting of marijuana therein, two roaches, described as the stubs or butts of partly smoked marijuana cigarettes, one set of scales and plastic bags, and a bottle of two kinds of pills, which according to the undisputed evidence were not controlled substances or illegal drugs and have no material bearing on the issues in the case.
Mrs. Gilliland was arrested and taken to jail on the afternoon the search of the apartment was conducted and soon after the items listed above were seized by the law enforcement authorities. According to the testimony of Deputy Sheriff Jerry Newton, the appellant came to the County Jail about five o’clock that afternoon. He was then processed by virtue of the warrant of arrest that had been issued for him for possession of the marijuana and, according to the testimony of Officer Newton, “approximately thirty to forty-five minutes later” Officer Newton advised him of his rights “according to the Miranda Warning” and he was shown a copy of the receipt for the items that had been seized. Officer Newton’s testimony continued as follows:
“Q. And did he make a statement to you at that time?
“A. Yes, ma’am, he did.
“Q. Did you tell him any thing else before he made a statement?
*153 “A. No, ma’am. Not after I advised him of his rights and then he signed a receipt for the stuff we had taken out of the house, no, ma’am.
“Q. Had you already questioned his wife?
“A. Yes, ma’am.
“Q. And had she made a statement to you as to whether or not she had? “A. Yes, ma’am.
“Q. Did you, before you took the statement from Mr. Gilliland, did you tell him what his wife had told you?
“A. Yes, ma’am. I did.
“Q. And what did Mr. Gilliland say to you on that occasion?
“A. He said that is the way it happened. He said it was, the marijuana, was brought there and left on Sunday night before we served the search warrant on Monday and the fellow that owned the marijuana was supposed to have picked it up on Monday afternoon.
“Q. And is that essentially the story you received from Mrs. Gilliland and told him before he spoke to you?
“A. Yes, ma’am.
[[Image here]]
“Q. And did you question him any further regarding this incident?
“A. Yes, ma’am. I asked him — I think I had asked him who it was that brought it over. And then he said it was like she said, a fellow named Bo Bo.
“Q. And did he tell you anything else regarding this incident?
“A. No, ma’am, he didn’t. That was the extent of the conversation.
“Q. Did you question him any more about why it was brought, or how they knew this fellow Bo Bo, or anything else about it?
“A. That’s all they would ever say. That it was just brought there by the subject on Sunday and he just wanted to leave it there during the day and he would pick it up that afternoon and they didn’t know what his last name was or nothing like that.
“Q. Did they know why it was left with them?
“A. No, ma’am, they never would give an explanation for that.”
Mrs. Gilliland was called as a witness by the defendant, but, on advice of her attorney, she declined to testify.
The defendant testified comprehensively to the effect that he was not guilty of the possession of marijuana. A significant part of his testimony is as follows:
“Q. Now, you heard them testifying about that, do you happen to remember by any means just where you were that night [sic]?
“A. Yeah, I was painting the inside and outside on a house. And I was doing the inside work in the evenings and the outside during the day.
“Q. Well, when did you first find out anything about the presence of these things in your house, if you know they were in your house at any time?
“A. Well, the baggies and the scales and the pills, my wife has been thyroid and water pills the last nine or ten years. And I didn’t know nothing about the other stuff. You see, my sister-in-law, she got ahold of me, I think I was out on a job or something. And she told me they had arrested my house [sic] and got my wife and I went up there. Well, I didn’t go right straight up to the jail house, I had a young man working with me and I wanted my work to go on so I got ahold of him to make sure it would go on and then I went up to the jail house.
[[Image here]]
“Q. Now, did you ever have anything in this world to do with possessing any of this stuff there that’s all stretched out there on the counter and you heard testified about and identified as marijuana? Did you ever have any occasion to possess any stuff around and about here or use it at all, or any of the kind?
“A. Yeah, them stat, them hemostats [apparently meaning the items that had been denominated by State’s witnesses *154 as “roach clips”]. I glaze windows, and I use them to ...
“Q. That is about all you used them for?
“A. I use them to get splinters out from under my fingernails.
“Q. In other words, you are saying you had no connection with making any use, possession or anything else with the marijuana in any form or fashion, is that right?
“A. That’s right.”
During the cross-examination of defendant, he testified:
“Q. You work during the day?
“A. Yes, ma’am.
“Q. But you were home in the evenings with your wife and daughter, were you not?
“A. Not all of the time.
“Q. Well, when were you absent during this period of time?
“A. When I worked. Sometimes I would be working on the outside and people would want me to paint around the windows and do stuff on the inside. And then in the evenings I would work on the inside, you know, two or three hours.
“Q. But after your worked two or three hours I presume you went home?
“A. I was usually home about 9:30 or 10:00.
“Q. And there until you went to work the next morning?
“A. 6:00 sharp.
“Q. You said these [which the writer considers was a reference to the items defendant called hemostats and others called roach clips], is that correct?
“A. Uh-huh.
“Q. Where did you get them?
“A. I don’t even know. I don’t know.
“Q. You don’t recall where you bought a hemostat?
“A. Yeah, let’s see ...
“Q. It is a surgical instrument, isn’t it?
“A. Yeah.
“Q. Did you buy it in a surgical store?
“A. No, I might have got them at a yard sale or something. I can’t remember. I use them for getting splinters out. My daughter runs barefoot a lot and they are just as good. There’s plenty of use for them. You can clamp them on any stick and they will come out.
“Q. You can clamp them down on a marijuana cigarette too, can’t you?
“A. Yes.
“Q. In fact, that is a common use of them by the layman other than surgeons, is that right?
“A. I don’t really know what they are used for, but I know they are good for a lot of things.
“Q. They sure are.
“A. I was a maintenance man and I used them too.
“Q. You used this to get splinters out also?
“A. No, ma’am.
“Q. Where did you get this?
“A. I don’t know.
“Q. Did you get them at the same yard sale, you think?
“A. I don’t know.
“Q. You don’t know where you got this?
“A. No.
“Q. Do you know how long you have had this?
“A. No, I don’t.
“Q. This belongs to you and your wife?
“A. Yes, ma’am.
“Q. Do you remember where you got this?
“A. No. I know it sounds like a [sic, but which we construe as a typographical error and should be I] have a vague memory, but I just don’t — I ain’t home a lot. I just come and go. It might have been a gift.
“Q. Do you know how it appeared in your dresser drawer, the marijuana and the roach clip lying amongst the marijuana?
“A. I don’t understand. Do you want me to know how I feel toward it?
*155 “Q. No, I want you to tell me how did it get in your dresser drawer there amongst your clothing, both the marijuana with the roach clip and another sealed bag of marijuana in it?
“A. I’m not even sure that all that clothing and stuff was in the first drawer. If I remember right it was—
“Q. Didn’t you just tell me that is where you kept your clothing was in the drawer there in the living room, in the chest of drawers.
“A. Yes.
“Q. Okay.
“A. But it was the only dresser drawer we had and I think in the top drawer was just junk, like cameras and films and everything.
“Q. Now, you think that that is not where your clothes were?
“A. No, I just said I’m not sure.
“Q. Well, you don’t know where you kept your clothes?
“A. Yeah, in the dresser.
“Q. But now you say you are not sure?
“A. It was on the dresser in the house. My clothes was in one of them drawers I know.
“Q. But you don’t remember now which one it was in?
“A. No.
“Q. You are just sure you didn’t keep it in with the marijuana?
“A. I still think, you know, like the top drawer had just whatnots and stuff in it.
[[Image here]]
“Q. And you don’t know how it [the marijuana] got there?
“A. No, I don’t.
“Q. You don’t know how long it had been there?
“A. I know how it got there from my wife.
“Q. How did it get there?
“A. We was holding it.
“Q. You were holding it? Who for?
“A. Perry Parish.
“Q. You were holding it for Perry Parish?
“A. (Witness nods).
“Q. When did Perry Parish bring it to y’all?
“A. I don’t know for sure, because I wasn’t there. I just know from what my wife had told me 8:00, 8:30 Sunday evening.
“Q. And when was Perry going to pick it up?
“A. In about a day.
“Q. Why were you holding it for Perry?
“A. For fifty dollars.
“Q. He was going to pay you fifty dollars for holding it for him? Did you bag it for him too?
“A. I don’t know, I wasn’t there.
“Q. But you knew that this was going on, that you were going to make fifty dollars?
“A. No, I didn’t know until after everything had taken place.
“Q. How long had you known Perry Parish?
“A. Seven or eight years.
“Q. And how many times had he brought marijuana for y’all to hold before?
“A. He didn’t ever brought none.
“Q. Who else brought it?
“A. Nobody ever brought it.
“Q. No further questions.”
Upon redirect examination, defendant testified as to his acquaintance with Perry Parish. We will refer to it later in this opinion in connection with a specific issue raised by appellant.
I.
By the first issue presented in the brief of counsel for appellant, he takes the position that the evidence was not sufficient to support the verdict and judgment convicting him of the possession of marijuana. The issue should not be lightly brushed aside, and we endeavor to give it the serious consideration it deserves. It is to be kept in mind that in order for a factual issue to have been presented as to appellant’s guilt, it would not have been necessary for the evidence to have shown that the defendant’s wife was not the only *156 one of the two sui juris individuals occupying the premises that could reasonably be said to have had constructive possession of the contraband between the time it was apparently placed by the wife some time before 8:00 and 8:30 P.M. one day and about 6:00 A.M. the next day, during all of which time the appellant was in the apartment. Although it cannot be said with absolute certainty that appellant knowledgeably had possession of the marijuana, we are of the opinion that the evidence was sufficient to present a jury issue as to whether the marijuana was in his apartment with his knowledge and consent and that the verdict of the jury finding defendant guilty was not contrary to the evidence as claimed by defendant-appellant. We decide appellant’s first issue adversely to him.
II.
Appellant’s next contention for reversal is directed at a ruling of the trial court during the testimony of Investigator Richard Mobley of the Alabama Bureau of Investigation, Narcotics Division, who participated in the search of the apartment of appellant and his wife and in the seizure of the items listed above. We quote a material part of such testimony as follows, commencing with the conclusion of the direct examination of the witness by the State:
“Q. And you obtained a search warrant from Judge Smith?
“A. Yes, ma’am.
“Q. Based on your affidavit, is that correct?
“A. Yes, ma’am.
“Q. Just for the record, is the black male, Bo Bo, is that the same person as your informant?
“A. No, ma’am.
“Q. And did the informant, on whose evidence you based your affidavit for the search warrant, was he involved in any way in the search, present there at any time when this search warrant was executed? Did he have any participation in the execution of the search warrant?
“A. No, ma’am.
“MS. LOGGINS: No further questions.
“CROSS-EXAMINATION:
“MR. COOK:
“Q. In your affidavit, Mr. Mobley, you referred to an informant?
“A. Yes, sir.
“Q. I’m going to ask you to tell the Court who that informant was?
“MS. LOGGINS: Your Honor, we would object.
“THE COURT: Sustain the objection.
“MR. COOK: And we are excepting to the ruling and we want to state that we are putting a Constitutional ground in the case here, that will be in the record. The Constitutional right that allows a Defendant to face his accusers face to face in each and every Courtroom. And we are putting that as our grounds for excepting to the Court’s ruling.
“THE COURT: All right, you may proceed.
“Q. And you are choosing not to tell who that informant was, is that right?
“MS. LOGGINS: Your Honor, we object.
“THE COURT: The objection has been sustained, Mr. Cook. It has been shown that he was not a participant in any way, was not present, consequently it would not be inquired into.”
The only cases cited by appellant on the point, Parsons v. State, 251 Ala. 467, 38 So.2d 209, and Dixon v. State, 39 Ala.App. 575, 105 So.2d 354, do not support appellant’s contention. His contention has been decided adversely to him in several cases, including Thornton v. State, Ala.Cr.App., 390 So.2d 1093, 1097-98 (1980), writ denied, Ala., 390 So.2d 1098, as follows:
“The informer in this case merely supplied information to the law enforcement officer to establish probable cause for a search of the appellant’s residence. See: Dixon v. State, 39 Ala.App. 575, 105 So.2d 354 (1958). The burden was on the accused to show why the disclosure of the informant was necessary to show his *157 innocence. Hatton v. State, Ala.Cr.App., 359 So.2d 822, cert. quashed, Ala., 359 So.2d 832 (1978). The appellant, through his own testimony before the jury, was allowed to develop his defense that he thought Willie Hardin was the informant and that Willie Hardin planted the drugs in his residence. The appellant testified that he saw Willie Hardin often, and he had last seen him five days before his trial. He had also told his attorney about Willie Hardin. The similarity between this case and Hatton ends there. “The appellant’s contention that he was denied the right to confront Willie Hardin (the alleged informant) under oath has no merit. In Hatton the suspected informant was actually called as a witness but the trial court restricted his testimony. However, in the instant case, the appellant failed to ask for compulsory process for the witness. The failure to ask for compulsory process is a waiver of it. Alabama Constitution 1901, Article I, § 6, Ex parte Craft, 41 Ala.App. 519, 138 So.2d 266 (1962).”
III.
Appellant contends by two related but separate issues presented in his brief: (1) that defendant should have been “allowed to tell something of his education and prior occupation in order to acquaint the jury with his general situation in life” and (2) that defendant should have been “allowed to testify that he loved his wife and child.” The targets of appellant’s contentions are to be found in the following continuous part of the transcript during appellant’s testimony on redirect examination.
“Q. And you’re a family man, you love your wife and child?
“MS. LOGGINS: We object to that, that is not relevant to this issue.
“THE COURT: I sustain the objection to that. That’s argumentative, Mr. Cook.
“Q. Terry, where were you born?
“MS. LOGGINS: Your Honor, we would object. We don’t see any relevance.
“A. Ohio.
“THE COURT: He answered it already for identification.
“MR. COOK: I’m going into the Defendant’s background if the Court please.
“Q. Where did you go to school?
“THE COURT: I sustain the objection to all that background, Mr. Cook. It is just a waste of time.
“MR. COOK: All of that background?
“THE COURT: Yes.
“MR. COOK: We are accepting [which we construe as excepting], we want to [sic] certain things about his schooling and course of study and so forth.
“MS. LOGGINS: We object, Your Honor.
“THE COURT: The objection has been sustained and I instruct you to proceed to something that is material, Mr. Cook.
As to (1), pertaining to defendant’s educational background, appellant relies upon Shepherd v. Gardner Wholesale, Inc., 288 Ala. 43, 256 So.2d 877, 879, where it is stated:
“Such a question, while not directly related to relevant matter, may be allowed. Questions to a witness directed toward aiding the jury in setting a proper estimate on the testimony of a witness are preliminary in their nature, and, as a general rule, may be properly asked, as, for example, questions which relate to the age of the witness, his residence, his occupation, and his condition in life. 98 C.J.S. Witnesses, § 344, p. 56.”
To be added, however, in the instant case, in which the trial court did not permit the particular inquiry, is what is found in 98 C.J.S. Witnesses, § 344, p. 57, citing Hunt v. State, 248 Ala. 217, 27 So.2d 186, 189, as follows:
“Discretion of court. Whether or not preliminary question should be allowed is in the discretion of the trial court.”
As to (2), that defendant should have been “allowed to testify that he loved his wife and child,” it is to be noted that *158 the content of the purported question indicates it was a declarative sentence rather than an interrogative one. We surmise that the question mark instead of a period at the end of the statement was by reason of the tone or inflection of the voice of defendant’s attorney, which would account for the court’s saying that it was “argumentative.” At any rate it is unquestionably leading, which, of itself, would have justified the sustention of the objection.
The trial court was not in error in sustaining the State’s objection to either the question of defendant’s counsel to defendant as to his educational background or the question of defendant’s counsel to defendant as to defendant’s love for his wife and child. In reaching this conclusion, we are not out of sympathy with the plight of defendant and defendant’s attorney, which has called for the following in the brief of counsel for appellant:
“When the Defendant’s testimony was obviously very poorly given and making a bad impression on all concerned and was ambiguous, the motivation for this (trying to keep the family together) should have been called to the Jury’s attention. Some juries might have jumped at the conclusion that by putting the wife on the witness stand even though she escaped inquiry by pleading the Fifth Amendment that Defendant was hostile to her and would not hesitate to have her imprisoned in spite of the dire effects this would have on the three year old child.”
Nevertheless, it should be stated that the transcript does not affirmatively show that the declination of defendant’s wife to testify was based on the Fifth Amendment. It could have been, as it has been a wife’s right in Alabama since 1915, that she exercised the right not to testify given her by Code 1975, § 12-21-227, which provides:
“The husband and wife may testify either for or against each other in criminal cases, but shall not be compelled to do so.”
IV.
The only other issue presented by appellant is directed at the sustention of the State’s objection to a question addressed on redirect examination of defendant by his attorney as to his relationship with Perry Parish, as to which he had been cross-examined by counsel for the State, which we have quoted in this opinion just before our discussion of the specific issues presented. We now set forth the ruling complained of and the context thereof:
“Q. Terry, as I understand your testimony, it was after your wife had been arrested, as a result of the search out there before you knew anything about Perry Parish leaving anything there, is that correct?
“A. Yes, that is what I was trying to explain her [sic]. The only thing I know on what happened is everything had taken place.
“Q. Since she asked you about Perry Parish, did he work for you as a painter one time?
“A. Yes, sir.
“Q. Did he work under your supervision?
“A. Yeah.
“Q. Had you had a run in with him about something just a few days before this incident occurred?
MS. LOGGINS: Your Honor, we object, that is not relevant to this case.
THE COURT: I sustain the objection.
MR. COOK: If the Court please, we offering it for the purpose of showing bad feelings by Perry Parish who the State illicited [sic] here as a motive for this thing.
THE COURT: I think that will be immaterial.
MR. COOK: All right we are accepting [which we consider a typographical error, and treat as “excepting”] to the Court’s ruling then.
THE COURT: You may proceed.
“Q. Just one more question, Perry Parish is a white man, isn’t he?
“A. (Witness nods).
“Q. Have you ever heard him called Bo Bo at any time in any of this.
*159 “A. No.
We agree with appellant to the extent that the inquiry that was sought to be covered by the question could well have shed some legitimate light on the issue of defendant’s guilt of knowingly possessing the marijuana, but we think that in some way the trial court should have been made aware by defendant’s counsel of what he expected to develop favorable to defendant from an answer to the question. Among the citations by appellant to support this contention is “22 A. C.J.S. pg. 698 [sic]”, 22 A C.J.S. Criminal Law § 675, as follows:
“In accordance with the rule stated supra § 673, declarations and exclamations, or acts and conduct of third persons which precede the offense immediately or by a short interval of time may be admissible as part of the res gestae, but statements and exclamations, or acts and conduct, which are so disconnected in point of time, circumstance, or event from the offense that they do hot form a part of the transaction, are not admissible as res gestae.”
The transcript does not disclose what would have developed favorable to defendant by an answer to the question to which the trial court sustained an objection, and we certainly are in no better position than the trial judge to determine whether the answer would have been material. As we cannot make such determination, we should not reverse the trial court for its ruling as to this issue.
In our opinion, appellant has presented no issue by which it is shown that error prejudicial to the appellant has been committed, and the judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a Judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.